IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br> Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF KENTUCKY; ANDREW BESHEAR, in his official capacity as Governor of Kentucky; RUSSELL COLEMAN, in his official capacity as Attorney General of Kentucky; THOMAS B. MILLER, in his official capacity as Commissioner of the Kentucky Department of Revenue; and the KENTUCKY HORSE RACING AND GAMING CORPORATION;<br><br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Case No. |

Plaintiffs, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege in this Complaint as follows:

## I.   INTRODUCTION

1. The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. § 1, *et seq.*, provides a comprehensive framework for the regulation of derivatives transactions in the United States. This federal law designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A).

2. On June 17, 2026, the Commonwealth of Kentucky filed enforcement actions in Franklin Circuit Court against entities comprising Kalshi, Polymarket, Robinhood, Coinbase, and

1

Webull. *See* Complaint, *Kentucky v. KalshiEX LLC et al.*, 26-CI-00689 (June 17, 2026) ("Kalshi Cmpl."); Complaint, *Kentucky v. QCX LLC et al.*, 26-CI-00696 (June 17, 2026) ("Polymarket Cmpl."). Kalshi and Polymarket are CFTC-regulated Designated Contract Markets ("DCMs") that offer event contracts on CFTC-regulated exchanges. Robinhood, Coinbase, and Webull are CFTC-registered Futures Commission Merchants that have partnered with DCMs to offer event contracts.

3.      The Commonwealth alleges numerous violations of the Kentucky Consumer Protection Act and Kentucky's gambling laws for the allegedly "unconscionable" and "unauthorized offering and facilitation of sports gambling within Kentucky." Kalshi Cmpl. ¶¶ 128, 129; Polymarket Cmpl. ¶ 98, 99. The Commonwealth contends that it has jurisdiction to regulate "event contracts" offered by or in partnership with DCMs because "they fall squarely within the definition of 'sports wagering' under Kentucky law." Kalshi Cmpl. ¶ 4; Polymarket Cmpl. ¶ 4.

4.      The event contracts targeted by Kentucky are "swaps" under the CEA, and the exchanges that offer these event contracts are CFTC-regulated DCMs.

5.      These enforcement actions are just the latest entries in Kentucky's campaign to banish prediction markets from within their borders. On April 14, 2026, the Kentucky legislature adopted House Bill 757, which purports to require prediction markets, including CFTC-regulated DCMs, to pay Kentucky an excise tax of 14.25% of their transaction fees *and* the notional value of each event contract traded in Kentucky or by a Kentucky resident. This tax essentially makes it impossible for prediction markets to operate in Kentucky, recalling Chief Justice Marshall's warning that "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819) (holding Supremacy Clause prohibited Maryland from taxing the federally chartered Second Bank of the United States).

6.      Kentucky's attempts to shut down federally regulated DCMs intrude on the

2

exclusive federal scheme Congress designed to oversee national swaps markets. Prompted by the evolution of national financial markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges. This comprehensive federal regulatory scheme preempts Kentucky law as applied to event contracts traded on federally regulated exchanges.

7.      Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event—which may relate to economics, or elections, or climate, or sports, or anything else of potential financial, economic, or commercial consequence—will occur. When structured as "swaps" or futures contracts as defined by the CEA, and traded on CFTC-regulated exchanges, they are subject to the exclusive jurisdiction of the CFTC.

8.      As of the date of filing of this complaint, at least eight CFTC-regulated DCMs have collectively self-certified with the CFTC more than 3,000 event contracts pursuant to CFTC Rule 17 C.F.R. § 40.2.

9.      Defendants misapprehend both the nature of the event contracts offered on CFTC-regulated DCMs and the federal regulatory framework applicable to these transactions. Event contracts, including sports-related event contracts that are listed on DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs. By prohibiting these DCMs from operating in Kentucky without a Kentucky license or by conditioning their operation on compliance with preempted Kentucky laws and regulations, Defendants directly interfere with Plaintiffs' authority pursuant to the federal scheme imposed by Congress through the CEA.

3

10.     Because Defendants' actions asserting regulatory authority over DCMs directly conflict with the CEA and rules promulgated by the CFTC under the CEA, those actions are preempted. This Court should put an end to Defendants' ongoing efforts to undermine the uniform application of federal law by declaring that Kentucky law, including but not limited to KRS Chapter 230 and the Kentucky Consumer Protection Act, is preempted as applied to event contract swaps listed for trading on CFTC-regulated DCMs and are thus unlawful.

11.     Unless restrained and enjoined by the Court, Defendants are likely to continue their attempts to subvert federal law and the CFTC's exclusive jurisdiction to regulate event contract swaps conferred on the Commission by Congress. Plaintiffs request that this Court enjoin the enforcement of these laws as applied to commodity derivatives markets and swaps traded on DCMs.

## II.   JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, preempts Kentucky's gambling laws insofar as they purport to regulate transactions on a CFTC-regulated DCM.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district and all defendants are residents of the State.

14.     The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

### III.   PARTIES

15.     Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its agency, the CFTC.

16.     Plaintiff the CFTC is an agency of the United States Government that regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its Executive Agency the Commodity Futures Trading Commission. The CEA grants the CFTC authority to represent itself through its General Counsel. 7 U.S.C. § 2(a)(4).

17.     Defendant Commonwealth of Kentucky is a state of the United States.

18.     Defendant Andrew Beshear is the Governor of Kentucky and is sued in his official capacity. Under the Kentucky Constitution, the Governor of Kentucky has "the supreme executive power of the Commonwealth," Ky. Const. § 69, and "shall take care that the laws be faithfully executed," Ky. Const. § 81.

19.     Defendant Russell Coleman is the Attorney General for the Commonwealth of Kentucky and is sued in his official capacity. The Attorney General of Kentucky is the state's chief legal officer. Ky. Rev. Stat. § 15.020(1). The headquarters of the Office of the Attorney General is located within the Eastern District of Kentucky in Frankfort, KY.

20.     Defendant Thomas B. Miller is the Commissioner of the Kentucky Department of Revenue and is sued in his official capacity. The Department of Revenue is tasked with "exercis[ing] all administrative functions of the state in relation to . . . [t]he state revenue and tax laws . . . [and] [t]he enforcement of revenue and tax laws." Ky. Rev. Stat. § 131.030(a), (h). Commissioner Miller is responsible for administering and collecting the excise tax imposed by H.B. 757. The Department of Revenue's headquarters is located within the Eastern District of Kentucky in Frankfort, KY.

21.    Defendant Kentucky Horse Racing and Gaming Corporation is "an independent, de jure municipal corporation and political subdivision of the Commonwealth." Ky. Rev. Stat. § 230.225(1). It is charged with regulating "all forms of live horse racing, pari-mutuel wagering, sports wagering, . . . and charitable gaming." *Id.*

## IV.    OTHER RELVANT ENTITIES OR AGENCIES

22.    KalshiEX LLC ("Kalshi") is a CFTC-regulated Designated Contract Market ("DCM"). Kalshi obtained CFTC designation as a Contract Market on November 3, 2020. Kalshi does business in the United States using the name "Kalshi" and offers products and transactions including event contract swaps through its website, www.Kalshi.com.

23.    QCX LLC is a CFTC-regulated DCM and does business in the United States under the name Polymarket US ("Polymarket"). Polymarket obtained CFTC designation as a Contract Market on July 9, 2025. Polymarket offers products and transactions including event contract swaps through its website, polymarket.com.

24.    Robinhood Derivatives LLC ("Robinhood") is a CFTC-registered Futures Commission Merchant ("FCM"). Robinhood obtained CFTC designation as an FCM on November 23, 2010. Robinhood offers event contract swaps in partnership with DCMs.

25.    Coinbase Financial Markets, Inc. ("Coinbase") is a CFTC-registered FCM. Coinbase obtained CFTC designation as an FCM on August 16, 2023. Coinbase offers event contract swaps in partnership with DCMs.

26.    Webull Corporation is a CFTC-registered FCM. Webull obtained CFTC designation as an FCM on October 24, 2025. Webull offers event contract swaps in partnership with DCMs.

## V.    FEDERAL LAW GOVERNING COMMODITY DERIVATIVES MARKETS

### A. Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivatives Markets

27.    The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3. The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

28.    Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate futures and derivatives markets. That authority includes the power to enforce the supremacy of federal law regulating futures and derivatives markets.

29.    The United States has well-established, comprehensive, and preemptive authority to regulate U.S. financial markets. The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States.

30.    The CFTC is the federal executive agency charged with administering and enforcing the CEA. Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

31.    Derivatives are financial instruments such as futures, options or swaps that derive their value from something else, like a benchmark or a physical commodity. In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

7

32.     The CEA requires that, subject to certain exemptions or exceptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC. For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade (*see* 7 U.S.C. § 6 and 17 C.F.R. § 48.3); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market (*see* 7 U.S.C. § 7b-3(a) and 17 C.F.R. § 37.3); commodity options must likewise be conducted on a board of trade designated as a contract market (*see* 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

33.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

34.     Designated Contract Markets are boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The CFTC designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, among other things, that DCMs:

8

a.  Establish, monitor, and enforce compliance with the rules of the market including (i) access requirements, (ii) the terms and conditions of any contracts to be traded, and (ii) rules prohibiting abusive trade practices;

b.  Have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the market;

c.  List only contracts that are not readily susceptible to manipulation;

d.  Have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including (i) methods for conducting real-time monitoring of trading and (ii) comprehensive and accurate trade reconstructions;

e.  Provide a competitive, open and efficient market and mechanism for executing transactions that protects the price discovery process;

f.   Maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information (i) to assist in the prevention of customer and market abuses and (ii) to provide evidence of any violations of the rules of the contract market;

g.  Establish and enforce rules and procedures for ensuring the financial integrity of transactions and the protection of customer funds; and

h.  Establish and enforce rules (i) to protect markets and market participants from abusive practices committed by any party and (ii) to promote fair and equitable trading on the contract market.

35.     The CFTC has enacted detailed rules governing the process through which a board of trade can achieve designation as a contract market, and detailed rules governing the operations of the contract market once that designation is in place. 17 C.F.R. § 38, *et seq.* DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the CFTC's regulations, 17 C.F.R. § 38, *et seq.*

36.     Event contracts listed on CFTC-regulated DCMs are a type of "swap" as defined by the CEA. Section 1a(47) of the CEA, 7 U.S.C. § 1a(47), broadly defines "swap" to include "any agreement, contract, or transaction":

9

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

37. The CEA and CFTC Regulations establish important protections for derivatives markets, market participants, and the general public by creating uniform regulations of a nationwide—and often international—market. For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse (7 U.S.C. § 7(d)(12)(A)); ensure their financial stability (7 U.S.C. § 7(d)(21)); protect their information security (17 C.F.R. § 38.1051(a)(2)); and safeguard their systems in the event of a disaster (17 C.F.R. § 38.1051(a)(3)). Further, DCMs must ensure that the contracts that they list for trading are "not readily susceptible to manipulation" (7 U.S.C. § 7(d)(3)); DCMs must "prevent market disruption" (7 U.S.C. § 7(d)(4)); DCMs must impose position limits designed to reduce the potential threat of market manipulation or congestion (7 U.S.C. § 7(d)(5)); DCMs must establish and enforce rules to minimize conflicts of interest (7 U.S.C. § 7(d)(16)); DCMs must provide impartial access to traders (17 C.F.R. § 38.151); and DCMs must maintain and retain important records and provide them to the Commission (7 U.S.C. § 7(d)(18)). And the CEA conferred on the CFTC enforcement authority to "bring an action in . . . [a] district court . . . to enjoin . . . or enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to

engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future deliver or any swap." 7 U.S.C. § 13a-1(a).

38.    Today, 25 exchanges in the United States have active designations from the CFTC to operate as a contract market, including Kalshi and Polymarket.

**B.  State Attempts to Shut Down National Markets Drives Early Derivatives Regulation**

39.    By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

40.    Illinois criminalized futures contracts. *See Melchert v. Am. Union Tel. Co.*, 11 F. 193, 196 (C.C.D. Iowa 1882) (quoting Ill. Rev. Stat. 1874, § 138). In 1888, the Illinois Supreme Court described "dealing in 'futures' or 'options'" as "a crime against the state, a crime against the general welfare and happiness of the people, a crime against religion and morality, and a crime against all legitimate trade and business." *Cothran*, 16 N.E. at 648.

41.    Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes and the Supreme Court noted in *Board of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or

11

mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

42.     Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States").

43.     Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936). But even as market participants expanded futures markets beyond their agricultural origins, those market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

**C. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974**

44.     In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric.*,* 93d Cong., 1st Sess. 121 (1973). Congress quickly responded,

12

explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

45.    With the passage of the CFTC Act of 1974, Congress amended the CEA to explicitly give the CFTC "exclusive jurisdiction" over commodity derivatives transactions including futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover "all commodities." Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets.

46.    The CFTC Act of 1974 amended Section 2 of the CEA to provide that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . )," and "transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market." CFTC Act of 1974, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)).

47.    Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Potentially limiting language was stricken from the

13

statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). The CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

### D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974

48.    Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.

49.    In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), reprinted in 1978 U.S.C.C.A.N. 2087, 2110-11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

14

50.     The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52. First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal statute" and the application of federal or state laws to off-exchange transactions or unregistered market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. *See* H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recognizing the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

51.     In 1992, Congress again adjusted its regulatory framework to capture a new type of derivative financial product: swaps. In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e), 7 U.S.C. § 16(e), expressly "supersed[ing] and preempt[ing] the application of any State or local" gambling or bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC had

15

exempted pursuant to its new authority in CEA Section 4(c), 7 U.S.C. § 6(c). While the 82 Act reserved to the States some authority to apply state and local laws to off-exchange futures transactions, the 92 Act cut back state authority for off-exchange swaps that received an exemption from the CFTC. Congress's goal was, again, to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), reprinted in 1992 U.S.C.C.A.N. 3179, 3212.

52.    Congress again limited the authority of States to regulate derivatives transactions in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements while also preempting the application of state and local laws to those "excluded" swap transactions. The existing preemption of state and local laws as to on-exchange transactions therefore remained in place, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

**E.  Congress Embraced Preemption for Swaps Transactions in the Dodd-Frank Act**

53.    In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the swaps market, creating a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of those swaps. The 2010 Dodd-Frank Act expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps," eliminating the remaining concurrent jurisdiction of States as to off-exchange swap transactions. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A). After Dodd-Frank, Congress had removed all authority for States to regulate swaps of any kind, creating a complete framework for the CFTC's exclusive jurisdiction and occupying the regulatory field.

54.    In the Dodd-Frank Act, Congress made clear that the CFTC has exclusive jurisdiction over event contracts. In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress provided the CFTC with specific oversight and prohibitory authority over event contracts. Under § 5c(c)(5)(C), the CFTC "may determine" that event contracts involving certain categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

55.    By creating a specific public interest review process, Congress signaled that these contracts belong within the CFTC's exclusive regulatory purview, not the states'.

F.    **The CFTC Uses Its Authority to Carry Out Congress's Directives**

56.    The CEA confers on the CFTC the authority to make rules governing swaps and other futures and derivatives contracts. See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7. Pursuant to that authority, the CFTC has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public. *See* 17 C.F.R. § 1.1, *et seq*.

57.    Part of the CFTC's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate. The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, *see* 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, *see* 17 C.F.R. § 40.2, or to submit a contract for the CFTC to approve, *see* 17 C.F.R. § 40.3.

58.    With respect to event contracts, the CFTC recently published a staff advisory letter to DCMs on prediction markets and event contracts. Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) (*see* CFTC Prediction Markets Advisory Press Release, https://www.cftc.gov/PressRoom/PressReleases/9193-26).

17

59.     To provide additional clarity in the marketplace, the CFTC is in the process of writing and revising its rules applicable to event contracts and prediction markets. On March 16, 2026, the CFTC published in the Federal Register an advance notice of proposed rulemaking soliciting public comments on prediction markets, 91 Fed. Reg. 12516 (Mar. 16, 2026). On June 12, 2026, the CFTC published in the Federal Register a Notice of Proposed Rulemaking seeking public comments on prediction markets, and more specifically, amendments to CFTC Regulation 40.11 and the addition of Appendix F to part 40 of the CFTC's Regulations, 91 Fed. Reg. 35806 (June 12, 2026).  And on June 18, 2026, the CFTC and the Securities and Exchange Commission issued a joint request for comment on definitional and regulatory clarity with respect to swaps. CFTC, *Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance*, RIN 3038-AF71.

## VI.   KENTUCKY TARGETS CFTC-REGULATED DESIGNATED CONTRACT MARKETS WITH DISCRIMINATORY EXCISE TAX AND ASSOCIATION RESTRICTIONS

### A. The Commonwealth Targets Prediction Markets with Prohibitive Excise Tax and Contracting Restrictions

#### 1. House Bill 757 Imposes an Excise Tax that Makes Offering Event Contracts in Kentucky Economically Infeasible

60.     On April 14, 2026, the Kentucky General Assembly overrode Governor Beshear's veto and enacted House Bill 757 as 2026 Ky. Acts Chapter 161.

61.     H.B. 757 amends KRS Chapter 138 and imposes on prediction market operators "an excise tax . . . of fourteen and one-quarter percent (14.25%) of the prediction market operator's transaction fees." H.B. 757, § 71(2).

62.     This tax takes effect on January 1, 2027. H.B. 757, § 71(2).

63.     The bill defines "transaction fee" as both the "fee charged by the prediction market operator to complete a sale, purchase, or trade of an event contract to a consumer" and "[t]he

amount paid by a consumer to purchase an event contract from a prediction market operator." *Id.*, § 71(1)(h)(1)-(2).

64.    H.B. 757 is expressly aimed at transactions regulated by the federal government, defining an event contract as "an agreement, contract, transaction, or swap in an excluded commodity based on the occurrence, extent of an occurrence, or contingency other than a change in the price, rate, value, or levels of a commodity described in 7 U.S.C. sec. 1a(19)(i), as amended." *Id.*, § 71(1)(c)(1). The definition excludes any "contract of sale of a commodity for future delivery, or any option on such a contract, executed on or subject to the rules of a designated contract market" and [a]ny swap or derivative based on" an "agricultural commodity," an "exempt commodity," or any "excluded commodity." *Id.*, § 71(1)(c)(2).

65.    Therefore, the statute's definition of event contracts—which are purportedly subject to the 14.25% excise tax—sweep in event contracts concerning not only sports, but elections, world events, weather, and myriad other topics.

66.    H.B. 757's excise tax on event contracts traded on prediction markets is orders of magnitude higher than Kentucky's excise taxes on state-licensed sports wagering.

67.    Under Kentucky law, sports wagers are subject to an excise tax of 9.75% "on the adjusted gross revenue on wagers placed at" licensed tracks and associations. KRS 138.552(2)(a). Sports wagers placed online via websites or mobile applications are subject to an excise tax of 14.25%, again on an adjusted gross revenue basis. KRS 138.552(2)(b). "Adjusted gross revenue" is defined as "the total sum of wagers collected on all sporting events, less winnings paid to participants in the contest and all excise taxes paid pursuant to federal law." KRS 138.552(1)(a).

68.    Consider the following example involving Kentucky residents Alice and Brandon:

(A)    Alice places a $50 wager on a Kentucky-approved online sportsbook on the University of Kentucky men's basketball team to win a matchup against the University of Louisville. The sportsbook offers this bet at -110 odds (meaning a winning bet of $110 nets $100 to the bettor). The Wildcats win, and the sportsbook pays Alice $95.45 (her original $50 plus $45.45 in winnings). The sportsbook remits a 13-cent excise tax to the federal government (0.25% of the $50 wager [*see* I.R.C. § 4401(a)(1)]). The sportsbook has lost $45.58 on Alice's wager. But Brandon bet $50 on the Cardinals to win, also at -110 odds. Because he lost, the sportsbook keeps his $50 wager (except for the 13 cents in federal excise tax). The sportsbook's adjusted gross revenue is $ 4.29 ($49.87 minus $45.58). Under KRS 138.552(2)(b), the sportsbook owes Kentucky 61 cents in excise tax (14.25% of $4.29). At the end of the day, the sportsbook has netted $3.68.

(B)    Now suppose Alice and Brandon are counterparties to an event contract titled, "Will the University of Kentucky Wildcats defeat the University of Louisville Cardinals in tonight's matchup?" The contract has a notional value of $1. Alice pays the prediction market operator $52 ($50 for 50 "Yes" contracts plus a $2 transaction fee). Brandon also pays the prediction market operator $52 ($50 for 50 "No" contracts plus a $2 transaction fee). The prediction market operator (or its clearinghouse) has collected $104. After the Wildcats' victory, it sends Alice $100 and keeps $4. But if H.B. 757's tax applies, the prediction market operator will owe Kentucky *$14.82* (14.25% of the amounts paid by Alice and Brandon to purchase the contracts [$100] and 14.25% of the fees charged by the prediction market operator [$4]). The prediction market operator has lost $10.82 on the transaction.[1]

---

[1] If H.B. 757's tax applied only to the fees the prediction market operator charges traders for executing a contract, the prediction market operator would pay Kentucky 57 cents (14.25% of $4) and would net $3.43 ($4 minus 57 cents).

20

69.     Under these economic circumstances, prediction market operators would have no choice but to cease operations in Kentucky.

70.     This outcome would be incompatible with federal law, which requires DCMs to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b); *see* ¶ 91, *infra*.

### 2. House Bills 904 and 869 Prohibit State-Licensed Operators from Contracting with Exchanges Offering Sports Event Contracts and Anyone Affiliated with Such Exchanges

71.     On April 14, 2026, the Kentucky legislature overrode Governor Beshear's veto of House Bill 904. This bill amends Kentucky's sports wagering statutes to target CFTC-regulated DCMs and the event contract swaps they offer. H.B. 904 became law on April 14, 2026, when it was delivered to the Secretary of State. 2026 Ky. Acts Chapter 184.

72.     H.B. 904 amended Chapter 230 of the Kentucky Revised Statutes to attempt to prohibit Kentucky-licensed sports wagering entities from "participat[ing] in or contract[ing] with platforms that offer events [sic] contracts through a prediction market." H.B. 904, § 22(9)(b). The new law also prohibited licensed sports wagering entities from contracting with any "service provider that . . . [o]wns, rents, licenses, advertises, operates, is partnered or affiliated with, or has a beneficial interest in . . . a prediction market[.]" *Id.*

73.     On April 15, 2026, the Kentucky legislature passed House Bill 869. Governor Beshear signed this bill into law on April 27, 2026, as 2026 Ky. Acts Chapter 198.

74.     H.B. 869 supposedly limits H.B. 904's prohibition by confining it to associations between a licensee and "an entity offering *sports* event contracts or a *sports* prediction market in Kentucky." H.B. 869, § 55(9)(d) (emphasis in original).

21

**B.  Kentucky Initiates Enforcement Actions Against Prediction Market Operators**

75.    On June 17, 2026, the Commonwealth of Kentucky filed enforcement actions in Franklin Circuit Court against entities including Kalshi, Robinhood, Coinbase, and Polymarket. *See* Complaint, *Kentucky v. KalshiEX LLC et al.*, 26-CI-00689 (June 17, 2026) ("Kalshi Cmpl."); Complaint, *Kentucky v. QCX LLC et al.*, 26-CI-00696 (June 17, 2026) ("Polymarket Cmpl.").

76.    The complaints allege that the defendants have violated the Kentucky Consumer Protection Act and Kentucky's gambling laws by their "unconscionable" and "unauthorized" offering and facilitation of sports gambling within Kentucky." Kalshi Cmpl. ¶¶ 128, 129; Polymarket Cmpl. ¶ 98, 99.

77.    Both complaints allege that "[a] wager on the outcome of a sporting event is not a 'swap' as defined in 7 U.S.C. § 1a(47)(A)(ii)." Kalshi Cmpl. ¶ 83; Polymarket Cmpl. ¶ at 61.

78.    Both complaints allege that "[a] wager on the outcome of a parlay is not a 'swap' as defined in 7 U.S.C. § 1a(47)(A)(ii)." Kalshi ¶ 88; Polymarket Cmpl. ¶ 66.

79.    Both complaints allege that "[a] wager on the outcome of a proposition bet is not a 'swap' as defined in 7 U.S.C. § 1a(47)(A)(ii)." Kalshi Cmpl. ¶ 90; at 24, Polymarket Cmpl. ¶ 68.

80.    The targeted entities provide event contracts available for trading, as regulated under the CEA and supervised by the CFTC. Each of these companies has been designated as a contract market under 17 C.F.R. Part 38 (or offers event contracts in partnership with a DCM) and lists these event contracts through the self-certification process outlined in 17 C.F.R. § 40.2 or the submission process outlined in 17 C.F.R. § 40.3.

81.    In these enforcement actions, Kentucky seeks actual and punitive damages, civil penalties, restitution, treble damages, and an order permanently enjoining the five defendant

22

entities from offering event contracts in Kentucky without first obtaining a Kentucky sports wagering license.

82.    Defendants' attempt to regulate and tax CFTC-regulated DCMs and entities that partner with them out of existence interferes with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market. The entire point of the CEA is to create a uniform and predictable nationwide market for futures trading, and the CFTC oversees that market via its certification process of DCMs and its requirements for DCMs to comply with the self-certification or submission certification requirements before listing event contracts. Defendants' letters and threatened legal actions would undermine that uniformity, thwart Congress's scheme, and intrude on Plaintiffs' exclusive jurisdiction by subjecting CFTC-regulated DCMs to regulation in all 50 states. Defendants' approach makes it much more difficult for the CFTC to regulate, advise, and enforce its authority over the DCMs, wasting resources and subverting the CFTC's congressionally mandated authority.

### VII.  THE CHALLENGED KENTUCKY STATUTES ARE PREEMPTED AS APPLIED TO COMMODITIES DERIVATIVES CONTRACTS

83.    The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

84.    The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894

(7th Cir. 2019) (quoting *American Ag. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

85.     "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992)(internal citation omitted); *see Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (Under the Supremacy Clause, state laws that conflict with federal law are "without effect."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (same); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law." (citation omitted)). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002).

86.     "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005). Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). And Congress has repeatedly expanded the CFTC's "exclusive jurisdiction" through continual amendments, most recently to include "transactions involving swaps." *Id.*; *see also* ¶¶ 44-59, *supra*. Congress therefore preempted state regulation of transactions subject to the CFTC's "exclusive jurisdiction," including swaps, and the DCMs that list them.

87.    Even without the express language of the CEA preempting state regulation, any state interference in DCM regulation is preempted because Congress "occupied the field" via the CEA and the CFTC and because any attempt at state regulation conflicts with federal law. *See Boomer,* 309 F.3d at 417. In general, state law must give way if "Congress, acting within its proper authority, has determined [a field] must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

88.    The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

89.    Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

90.    A state applying local gambling laws to federally regulated DCMs also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). To the extent state laws could apply to federally regulated swaps and derivatives, those laws are preempted as applied to those transactions and market participants because complying with both state and federal law would be an impossibility, and because those state laws, as applied, obstruct Congress's clear intent.

91.    Complying with both state regulations and the CEA is impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

92.    State gambling regulations, as applied to DCMs, also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). State gambling laws often require local licensing, fees, enforcement, and specific hardware. Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent. Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them. *See* ¶¶ 44-59, *supra*.

93.     In enacting the CEA and expanding it over time to provide the framework for commodity derivatives markets in the United States, Congress found that commodity derivatives transactions "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovery prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

94.     Therefore, the federal Commodity Exchange Act which provides the CFTC with "exclusive jurisdiction" over transactions on CFTC Designated Contract Markets, 7 U.S.C. § 2, preempts Kentucky statutes that purport to prohibit, limit, or condition the listing or trading of event contract swaps on CFTC-regulated Designated Contract Markets.

## VIII.  CLAIMS FOR RELIEF

### A.  COUNT I – KENTUCKY LAW VIOLATES THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION AS APPLIED TO TRANSACTIONS ON CFTC-REGULATED DESIGNATED CONTRACT MARKETS

95.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

96.     The United States has a cause of action in equity to sue to enjoin a state law's implementation and enforcement of a law that violates the Supremacy Clause. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("Our decisions have established, too, the general rule that the United States may sue to protect its interests."); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (recognizing the "equitable tradition" of suits by the United States "to enjoin a state law's implementation and enforcement or for other appropriate relief").

97.     The event contracts targeted by Kentucky's enforcement actions are swaps as defined by the CEA. *See* 7 U.S.C. §1a(47)(A).

98.    The "prediction markets" targeted by Kentucky's enforcement actions are Designated Contract Markets that are registered, monitored, and regulated by the Commission.

99.    The CEA confers upon the Commission "exclusive jurisdiction" over "accounts, agreements . . . and transactions involving swaps . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). The CEA otherwise creates a comprehensive regulatory structure for overseeing swaps traded on DCMs, which the Commission—and only the Commission—is charged by Congress with administering.

100.    Kentucky state law—including but not limited to the Kentucky Consumer Protection Act, KRS Chapter 230, and KRS Chapter 138—is preempted by the Commodity Exchange Act, 7 U.S.C. § 2.

101.    Kentucky state law—including but not limited to the Kentucky Consumer Protection Act, KRS Chapter 230, and KRS Chapter 138—as applied to transactions listed, offered, or executed on CFTC-regulated Designated Contract Markets is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

102.    Kentucky state law—including but not limited to the Kentucky Consumer Protection Act, KRS Chapter 230, and KRS Chapter 138—as applied to transactions listed, offered, or executed on CFTC-regulated Designated Contract Markets is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, *see generally*, 7 U.S.C. § 2.

103.    Kentucky state law—including but not limited to the Kentucky Consumer Protection Act, KRS Chapter 230, and KRS Chapter 138—as applied to transactions listed, offered, or executed on CFTC-regulated Designated Contract Markets is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and obstacle

28

preempted because it thwarts Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

## IX.    RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

1.    That this Court enter a judgment declaring that Kentucky state law—including but not limited to the Kentucky Consumer Protection Act, KRS Chapter 230, and KRS Chapter 138—as applied to CFTC-regulated Designated Contract Markets, violates the Supremacy Clause and is therefore preempted, unconstitutional and invalid;

2.    That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions as applied to CFTC-regulated Designated Contract Markets;

3.    That this Court award Plaintiffs their costs and fees in this action; and

4.    That this Court award any other relief it deems just and proper.

Dated: June 23, 2026

Respectfully submitted,

By: /s/ David W. Rubin
David W. Rubin
Senior Assistant General Counsel
Commodity Futures Trading Commission

*Attorneys for the United States of America*

*Attorneys for the Commodity Futures Trading Commission*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
tiberius.davis@usdoj.gov
Tel. 202-860-8970

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
alexandra.schulte@usdoj.gov
Tel. 202-718-0483

TYLER S. BADGLEY (tbadgley@cftc.gov)
  General Counsel
M. JORDAN MINOT (jminot@cftc.gov)
  Deputy General Counsel
DAVID W. RUBIN (drubin@cftc.gov)
  Senior Assistant General Counsel
HENRY J. DICKMAN (hdickman@cftc.gov)
  Senior Assistant General Counsel
  (Ill. Bar No. 6275516)
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
Tel. 202-209-1087
Fax. 202-418-5567