IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF KENTUCKY; ANDREW BESHEAR, in his official capacity as Governor of Kentucky; RUSSELL COLEMAN, in his official capacity as Attorney General of Kentucky; THOMAS B. MILLER, in his official capacity as Commissioner of the Kentucky Department of Revenue; and the KENTUCKY HORSE RACING AND GAMING CORPORATION;<br><br>Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br><br>Case No. 3:26-cv-49-SCM<br><br>Honorable S. Chad Meredith |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    I.  The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets ..................................................... 3

    II.  Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading ................................................................................. 4

    III.  Event contracts have long traded subject to Commission oversight .............................. 7

    IV.  Kentucky targets prediction markets with a prohibitive excise tax and contracting restrictions ......................................................................................................................... 8

    V.  Kentucky initiates enforcement actions against CFTC-regulated DCMs and FCMs..... 10

LEGAL STANDARD............................................................................................................... 10

ARGUMENT .......................................................................................................................... 11

    I.  Plaintiffs have standing...................................................................................................... 12

    II.  Plaintiffs are likely to succeed in establishing that federal law preempts Kentucky law as applied to commodity derivatives transactions .................................................... 14

        A.  Event contracts are "swaps" under the CEA ........................................................... 14

        B.  The CEA preempts state law ..................................................................................... 17

    III.  The remaining factors favor granting preliminary relief................................................ 23

CONCLUSION....................................................................................................................... 25

i

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alabama Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979) ........................................................................................ 15

*American Agric. Movement, Inc. v. Board of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ......................................................................................... 22

*Arizona v. United States*,
  567 U.S. 387 (2012) .................................................................................................... 17, 20

*Atlantic Richfield Co. v. Christian*,
  590 U.S. 1 (2020) ............................................................................................................ 20

*Cargill, Inc. v. Hardin*,
452 F.2d 1154 (8th Cir. 1971) ............................................................................................ 4

*Carson v. Milwaukee Produce Co.*,
  113 N.W. 393 (Wis. 1907) ................................................................................................. 5

*CFTC v. Spagnuolo*,
  No. 1:26-cv-4419 (S.D.N.Y.) ...................................................................................... 8, 25

*CFTC v. Trade Exch. Network Ltd.*,
  117 F. Supp. 3d 29 (D.D.C. 2015) ................................................................................... 15

*CFTC v. Van Dyke*,
  No. 1:26-cv-3369 (S.D.N.Y.) ...................................................................................... 8, 25

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011) ........................................................................................................ 17

*Christensen Hatch Farms, Inc. v. Peavey Co.*,
  505 F. Supp. 903 (D. Minn. 1981) ................................................................................... 18

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
  162 F.4th 631 (6th Cir. 2025) .................................................................................... 11, 24

*Cigna Corp. v. Bricker*,
  103 F.4th 1336 (8th Cir. 2024) ....................................................................................... 24

*Cohn v. Brinson*,
  73 So. 59 (Miss. 1916 ........................................................................................................ 5

ii

*Cothran v. Ellis*,
   16 N.E. 646 (Ill. 1888) ................................................................................................. 4

*Cunningham v. National Bank of Augusta*,
   71 Ga. 400 (1883) ........................................................................................................ 5

*Department of Commerce v. New York*,
   588 U.S. 752 (2019).................................................................................................... 13

*Dickson v. Uhlmann Grain Co.*,
   288 U.S. 188 (1933)...................................................................................................... 5

*Effex Cap., LLC v. National Futures Ass'n*,
   933 F.3d 882 (7th Cir. 2019) ................................................................................. 18, 21

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001)...................................................................................... 6

*Hughes v. Talen Energy Mktg., LLC*,
   578 U.S. 150 (2016).................................................................................................... 17

*KalshiEX LLC v. Johnson*,
   __ F. Supp. 3d __, 2026 WL 1223373 (D. Ariz. May 5, 2026)............................ *passim*

*KalshiEX LLC v. Martin*,
   793 F. Supp. 3d 667 (D. Md. 2025)............................................................................ 19

*KalshiEX LLC v. Orgel*,
   No. 3:26-cv-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)............................. 2, 15

*Kalshiex LLC v. Schuler*,
   No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026)........................................ 19

*KalshiEX, LLC v. Flaherty*,
   172 F.4th 220 (3d Cir. 2026) .................................................................................. *passim*

*Kansas v. Garcia*,
   589 U.S. 191 (2020).................................................................................................... 20

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980)........................................................................................ 18

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................................................... 12

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) ............................................................................................. 1

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
   564 F. Supp. 2d 298 (S.D.N.Y. 2008) ............................................................... 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982) ................................................................................... *passim*

*Mohr v. Miesen*,
   49 N.W. 862 (Minn. 1891) .................................................................................. 4

*Monsanto Co. v. Durnell*,
   __ U.S. __, 2026 WL 1825691 (June 25, 2026) ............................................... 19

*Murphy v. National Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) .......................................................................................... 20

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................................... 11

*Pharmacy Rsch. & Manufacturers of Am. v. McClain*,
   95 F.4th 1136 (8th Cir. 2024) ........................................................................... 22

*Preston v. Thompson*,
   589 F.2d 300 (7th Cir. 1978) ....................................................................... 23, 24

*Rice v. Board of Trade of Chicago*,
   331 U.S. 247 (1947) ............................................................................................ 5

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .......................................................................................... 12

*Stuber v. Hill*,
   170 F. Supp. 2d 1146 (D. Kan. 2001) ............................................................... 20

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
   608 F.3d 200 (5th Cir. 2010) ............................................................................ 23

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
   322 F.3d 1039 (9th Cir. 2003) .......................................................................... 19

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ................................................................... 23, 24

iv

*United States v. California*,
   173 F.4th 1060 (9th Cir. 2026) ...................................................................................... 23

*United States v. Ekblad*,
   732 F.2d 562 (7th Cir. 1984) ........................................................................................ 12

*United States v. Florida*,
   172 F.4th 1201 (11th Cir. 2026) .................................................................................... 12

*United States v. Missouri*,
   114 F.4th 980 (8th Cir. 2024) ....................................................................................... 12

*United States v. Phillips*,
   155 F.4th 102 (2d Cir. 2025) ........................................................................................ 14

*United States v. Texas*,
   97 F.4th 268 (5th Cir. 2024) ........................................................................................ 13

*Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Econ. Dev. Corp.*,
   658 F.3d 684 (7th Cir. 2011) ........................................................................................ 17

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................................... 11

Statutes

31 U.S.C. § 5362(10)(A) ................................................................................................ 16

7 U.S.C. § 1a(47), CEA § 1a(47) .......................................................................... *passim*

7 U.S.C. § 2(a)(1)(A) ............................................................................................. *passim*

7 U.S.C. § 5 .................................................................................................................. 3, 11

7 U.S.C. § 7 .................................................................................................................. 4, 21

7 U.S.C. § 7a-2(c)(5)(C) ........................................................................................ *passim*

7 U.S.C. § 13a-2 .......................................................................................................... 18

7 U.S.C. § 16(e) .......................................................................................................... 19

7 U.S.C. § 16(h) ..................................................................................................... 19, 20

Commodity Futures Trading Commission Act of 1974,
  Pub. L. No. 93-463, 88 Stat. 1389 (1974) .................................................................... 5

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................................. 6

Kentucky Consumer Protection Act,
  KRS 367.110 *et seq.* ...................................................................................................... 1

Kentucky House Bill 757,
  2026 Ky. Acts Chapter 161 ..................................................................................... *passim*

KRS Chapter 230 ....................................................................................................... 25

KRS 138.552 ................................................................................................................. 9

Regulations

17 C.F.R. § 38.150(a) ...................................................................................................... 4

17 C.F.R. § 38.151(b) .................................................................................................... 22

17 C.F.R. § 38.200 ......................................................................................................... 4

17 C.F.R. § 38.250 ......................................................................................................... 4

17 C.F.R. § 40.11(c)(2) ................................................................................................. 21

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
  73 Fed. Reg. 25,669 (May 7, 2008) ........................................................................... 7

Prediction Markets; Advance Notice of Proposed Rulemaking,
  91 Fed. Reg. 12,516 (Mar. 16, 2026) ....................................................................... 16

Prediction Markets; Public Interest Determinations,
  91 Fed. Reg. 35,806 (June 12, 2026) .......................................................................... 8

Legislative Materials

120 Cong. Rec. S 30458 (Sept. 9, 1974) ................................................................. 6, 21

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ........................................................... 6, 21

Hearings Before the S. Comm. on Agric. & Forestry
  on S. 2485, S. 2578, S. 2837, H.R. 13113,
  93d Cong., 2d Sess. 685 (1974). ........................................................................... 23

S. Rep. No. 93-1131 (1974) ..................................................................................... 6

Other Authorities

CFTC Staff Letter No. 93-66 (June 18, 1993),
  https://www.cftc.gov/sites/default//files/idc/groups/
  public/@lrlettergeneral/documents/letter/93-66.pdf ..................................... 7

CFTC, Contracts & Products,
  https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm ...................................... 7

CFTC, Futures Glossary: A Guide to the Language of the Futures Industry,
  https://www.cftc.gov/LearnAndProtect/
  AdvisoriesAndArticles/CFTCGlossary/index.htm. ........................................ 3

CFTC,
  Joint Request for Comment on Further Definition of "Swap"
  and "Security-Based Swap" and on Alternative Compliance,
  RIN 3038-AF71 (June 18, 2026) ...................................................................... 8

CFTC, Release Number 9199-26,
  CFTC and MLB Sign Groundbreaking MOU (Mar. 19, 2026),
  https://www.cftc.gov/PressRoom/PressReleases/9199-26 ............................... 8

CFTC, Release Number 9235-26 (May 21, 2026),
  https://www.cftc.gov/PressRoom/PressReleases/9235-26 ............................... 8

Kevin T. Van Wart, Preemption and the Commodity Exchange Act,
  58 Chicago-Kent L. Rev. 657, 670 (1982) ....................................................... 5

William W. Mansfield, A Digest of the Statutes of Arkansas § 1848
  (U.M. Rose ed., 1884) ....................................................................................... 5

**PRELIMINARY STATEMENT**

Plaintiffs the United States and the Commodity Futures Trading Commission ("CFTC" or "Commission") seek a preliminary injunction prohibiting Kentucky from continuing its targeted campaign to usurp federal jurisdiction to regulate derivatives markets and banish prediction markets from the Commonwealth. On June 17, 2026, the Commonwealth filed enforcement actions in Franklin Circuit Court against entities comprising CFTC-regulated Designated Contract Markets ("DCMs") Kalshi and Polymarket and CFTC-regulated Futures Commission Merchants ("FCMs") Robinhood, Coinbase, and Webull. The Commonwealth alleges numerous violations of its Consumer Protection Act and sports gambling laws on the basis that these exchanges are "acting as unlicensed sports wagering providers" by offering CFTC-regulated sports event contracts for trading. Kentucky seeks per-violation civil penalties, actual and punitive damages, restitution, disgorgement, treble damages, and injunctive relief.

These enforcement actions are just the latest strike in Kentucky's crusade to ban prediction markets from operating within its borders. In April, the Kentucky legislature adopted House Bill 757, imposing on CFTC-regulated DCMs a 14.25% fee on the revenue collected by the DCMs *and* on the notional value of every event contract traded in Kentucky or by a Kentucky resident worldwide. Meanwhile, the Commonwealth imposes on licensed in-person and online sports wagering providers excise taxes of 9.75% and 14.25%, respectively, of their adjusted gross revenue—calculated as the total sum of all sports wagers collected *less winnings paid*. H.B. 757's fee would entirely impede prediction markets' operations in Kentucky, *see supra* 8–10, recalling Chief Justice Marshall's admonition that "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819) (holding that the Supremacy Clause prohibited

1

Maryland from targeting the federally chartered Second Bank of the United States with a protectionist tax).

Kentucky's actions violate the Supremacy Clause because Congress expressly conferred on the CFTC exclusive jurisdiction to regulate the trading of these types of contracts on DCMs. Under the Commodity Exchange Act ("CEA" or the "Act"), the event contracts that Kentucky seeks to prohibit are "swaps," and the CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate, among other things, "transactions involving swaps" that are traded on DCMs. 7 U.S.C. § 2(a)(1)(A). More broadly, the Act provides a "comprehensive regulatory structure [for] oversee[ing] the volatile and esoteric futures trading complex" that is administered—and administered only—by the Commission. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). Congress expressly preempted state law regulating derivatives markets to ensure the efficient working of the federal regulatory scheme, and state law that purports to regulate DCM-traded swaps is therefore preempted.

Kentucky is far from the first state to intrude into the Commission's regulatory jurisdiction over event contracts—and courts have been swift to respond with injunctive relief. In April 2026, the Third Circuit upheld a preliminary injunction barring New Jersey from enforcing its gambling laws against sports event contracts listed by KalshiEX. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026). And the District of Arizona and the Middle District of Tennessee have entered preliminary injunctions enjoining states from enforcing their gambling laws as applied to sports event contracts listed on CFTC-regulated DCMs. *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *KalshiEX LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at *12 (M.D. Tenn. Feb. 19, 2026).

2

The case for emergency injunctive relief here is even stronger. Kentucky seeks to expel prediction markets with enforcement actions seeking wide-ranging penalties against a bevy of CFTC-regulated entities and a discriminatory, prohibitive, and extraterritorial fee that will make trading event contracts in the Commonwealth economically impracticable. The CEA created a uniform federal regulatory scheme for derivatives trading precisely to prevent this type of market disruption. The Court should enjoin Kentucky's incursion into the CFTC's exclusive jurisdiction because it violates the Supremacy Clause and undermines Congress's express directives.

## BACKGROUND

**I.    The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets**

The CEA provides a comprehensive framework governing transactions in U.S. commodity derivatives markets. The CFTC is the federal executive agency that administers the CEA, enforces it in federal courts, and regulates derivatives markets. A "derivative" is a financial instrument such as a future, option, or swap for which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial commodity.[1] In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

In enacting the CEA, Congress specifically identified a public interest in federal regulation of derivatives markets because those markets provide a means to distribute economic risks via hedging and speculation. *See* 7 U.S.C. § 5. "Hedging" involves the use of derivatives to protect against price fluctuations.[2] Like securities markets, commodity derivatives markets also include

---

[1] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[2] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk. It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of fuel increases. On the other hand, a fuel supplier might manage the risk that

3

"speculators" who profit from price movements. Speculators are important because they help ensure that hedgers can find counterparties with whom to trade, thereby fostering price discovery and liquidity in the markets. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1158 (8th Cir. 1971).

Many derivatives must be traded on a Designated Contract Market, or DCM. DCMs are national boards of trade or exchanges that operate under the Commission's regulatory oversight. *See* 7 U.S.C. § 7. The Commission designates an exchange as a DCM through a formal application process in which an applicant must demonstrate its ability to comply with detailed statutory and regulatory requirements called "core principles." *Id.* § 7(d). These core principles require DCMs to, among other things, establish and enforce compliance with market rules, 17 C.F.R. § 38.150(a); list only contracts that are not readily susceptible to manipulation, *id.* § 38.200; and have the capacity to prevent manipulation or price distortions, *id.* § 38.250. Today, 25 exchanges in the United States have active designations from the Commission to operate as a DCM.

## II.      Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading

Kentucky's attempt to ban derivatives trading is nothing new. Before Congress entered the field of futures regulation, States often failed to distinguish between futures trading and illegal "gambling" or "wagering." The Illinois Criminal Code provided that "the option to sell or buy at a future time any grain or commodity . . . shall be considered gambling contracts, and shall be void." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). The Minnesota Supreme Court described "betting upon the price of wheat, [as] against public policy, and not only void, but deserving of the severest censure." *Mohr v. Miesen*, 49 N.W. 862, 863 (Minn. 1891) (quoting *Rumsey v. Berry*, 65 Me. 570, 574 (1876)). Likewise, the Georgia Supreme Court described futures contracts for cotton

---

the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

as "speculation on chances, a wagering and betting between the parties." *Cunningham v. National Bank of Augusta*, 71 Ga. 400, 403 (1883). And so on. *See Cohn v. Brinson*, 73 So. 59, 62 (Miss. 1916) (describing "the buying of cotton futures [as] a wager"); *Carson v. Milwaukee Produce Co.*, 113 N.W. 393, 395 (Wis. 1907) (describing commodity futures contracts as "gambling contracts" that are "void"); William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884) (declaring that "[t]he buying or selling or otherwise dealing in what is known as futures . . . with a view to profit, is hereby declared to be gambling").

Congress, by contrast, "has recognized the potential hazards as well as the benefits of futures trading," and it accordingly "has authorized the regulation of commodity futures exchanges for over [100] years," beginning with the Future Trading Act of 1921 and Grain Futures Act of 1922. *Curran*, 456 U.S. at 360. Those early federal forays into futures regulation, however, failed to preempt state law. *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933) (holding that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal").

The CEA, enacted in 1936, broadened the federal government's regulatory authority over futures trading and prompted a "[g]radual state retreat from . . . the entire field of commodities futures regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 670 (1982). But the Supreme Court again held that States could regulate aspects of commodities trading, explaining that Section 4c of the CEA "serves the function of preventing supersedure and preserving state control in [] areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947).

The key turning point came in 1974, when Congress created the Commission and conferred on it "exclusive jurisdiction" over futures trading. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389,

5

1395 (1974) (codified at 7 U.S.C. § 2(a)(1)(A)). "The aim of this provision" was to "'avoid unnecessary, overlapping and duplicative regulation.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The 1974 Act also removed Section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). Leading proponents of the Act repeatedly indicated that futures regulation would be subject solely to Commission oversight, not state law. *See, e.g.*, H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

Congress has further expanded the preemptive reach of the CEA over the subsequent decades—particularly with respect to "swaps." A "swap" is a type of derivative that encompasses "any agreement, contract, or transaction . . . that provides for any . . . payment[ ] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . ., and transactions involving swaps." Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)). It also added a "Special Rule" granting the Commission authority to prohibit certain swaps called "event contracts" if the Commission determines they are contrary to the public interest. *Id.* § 745(a), 124 Stat. at 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)).

6

### III.    Event contracts have long traded subject to Commission oversight

An "event contract" is a CFTC-regulated "derivative contract whose payoff is based on a specified event, occurrence, or value."[3] While event contracts have become more popular with the American public in recent years, these contracts are not novel innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[4] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages." 73 Fed. Reg. at 25,670.

Today, event contracts are listed on numerous CFTC-registered DCMs, whether they be relatively new markets like KalshiEX ("Kalshi"), QCX ("Polymarket"), and Gemini Titan, or longstanding ones like North American Derivatives Exchange ("Nadex") and CME Group. The Commission exercises its exclusive jurisdiction over the transactions on these DCMs by, among other things, requiring them to complete a registration process with the Commission before listing products for trading, monitoring their activity, and pursuing enforcement actions as appropriate.

The Commission is also taking additional steps to ensure market integrity around the trading of event contracts. The Commission has signed Memoranda of Understanding with Major

---

[3]    CFTC, *Contracts & Products*, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

[4] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

League Baseball and the National Hockey League, which establish a framework for the leagues to exchange information with the Commission to permit information sharing to ensure market integrity in sports-related event contracts.[5] The Commission filed enforcement actions against a U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro and a Google employee who used confidential company information to trade event contracts related to year-end Google search results rankings. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.). On June 12, 2026, the Commission issued a Notice of Proposed Rulemaking proposing amendments to its rules concerning event contracts. *See* 91 Fed. Reg. 35,806 (June 12, 2026). And most recently, the CFTC and the Securities and Exchange Commission issued a joint request for comment on definitional and regulatory clarity with respect to swaps. CFTC, *Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance*, RIN 3038-AF71 (June 18, 2026).

IV. **Kentucky targets prediction markets with a prohibitive excise tax and contracting restrictions**

On April 14, 2026, the Kentucky General Assembly enacted House Bill 757. 2026 Ky. Acts Chapter 161. The bill purports to impose on prediction market operators "an excise tax . . . of fourteen and one-quarter percent (14.25%) of the prediction market operator's transaction fees," which takes effect on January 1, 2027. H.B. 757, § 71(2). This tax is unusual in three ways. First, it applies to event contracts traded by Kentucky residents even when they are not present in the state. *Id.,* § 71(1)(a)(1), (h)(1). Second, it applies to both the "fee charged by the prediction market

---

[5] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26, *CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey* (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

operator to complete a sale, purchase, or trade of an event contract to a consumer" and "[t]he amount paid by a consumer to purchase an event contract from a prediction market operator." *Id.*, § 71(1)(h)(1)–(2). Third, it applies not only to sports event contracts, but also to event contracts concerning elections, world events, weather, and myriad other topics. *See id.* § 71(1)(c)(1)–(2).

The Commonwealth's excise tax on licensed sports wagering is markedly different from the proposed tax on prediction markets. Under Kentucky law, sports wagers are subject to an excise tax of 9.75% for in-person wagers and 14.25% for online wagers. KRS 138.552(2)(a), (b). And, most significantly, the tax base consists of a licensee's "adjusted gross revenue," which is defined as "the total sum of wagers collected on all sporting events, less winnings paid to participants in the contest and all excise taxes paid pursuant to federal law." KRS 138.552(1)(a). The incongruity in the calculation of each tax base leads to absurdly disparate results.

In April 2026, Kentucky-licensed sports wagering providers collected roughly $226 million in wagers; paid out roughly $200 million in winnings and $500,000 in federal excise taxes; and remitted to the Commonwealth roughly $3.7 million in excise tax.[6] Under H.B. 757, if a prediction market facilitates trading of event contracts with a total notional value of $226 million, Kentucky would assess more than $32 million in tax before the exchange charges its first transaction fee. Just to break even, the exchange would need to impose an average transaction fee of over 16%. By way of example, Kalshi's variable trading fee does not exceed 4%. *See* Kalshi Fee Schedule, Kalshi.com/docs/kalshi-fee-schedule.pdf.[7]

---

[6] KHRGC Sports Wagering, Sports Wagering Market Report for April 2026, https://public.tableau.com/app/profile/khrc.sports.wagering/viz/SportsWageringMarketReport/ SWStory (last visited June 30, 2026).

[7] For another illustration of H.B. 757's disparate treatment of state-licensed sports wagering providers and prediction markets, see Compl., Dkt. No. 1 ¶ 68.

In April 2026, the General Assembly also passed House Bills 904 and 869. Together, they purport to prohibit Kentucky-licensed sports wagering providers from contracting with (1) "an entity offering sports event contracts or a sports prediction market in Kentucky or (2) "a licensed sports wagering service provider" that "[o]ffers sports event contracts through a prediction market" or "[o]wns, rents, licenses, advertises, operates, is partnered or affiliated with . . . an entity that makes available to its users . . . a sports prediction market" in Kentucky. H.B. 869, § 55(9)(c)–(d).

## V.    Kentucky initiates enforcement actions against CFTC-regulated DCMs and FCMs

On June 17, 2026, Kentucky filed enforcement actions against CFTC-regulated DCMs Kalshi and Polymarket and CFTC-regulated FCMs Robinhood, Coinbase, and Webull.[8] These entities provide event contracts available for trading, regulated under the CEA by the CFTC.

Kentucky alleges that the exchanges have violated Kentucky's Consumer Protection Act and gambling laws with their "unconscionable" and "unauthorized offering and facilitation of sports gambling within Kentucky." Kalshi Compl. ¶¶ 128, 129; Polymarket Cmpl. ¶ 98, 99. To support its allegations, the Commonwealth asserts that a "wager on the outcome of a sporting event," "a parlay," or "a proposition bet" "is not a 'swap' as defined in 7 U.S.C. § 1a(47)(A)(ii)." Kalshi Compl. ¶¶ 83, 88, 90; Polymarket Cmpl. ¶¶ 61, 66, 68. In these enforcement actions, Kentucky seeks actual, punitive, and treble damages; civil penalties; restitution; and an injunction prohibiting the five defendant entities from offering event contracts in Kentucky without first obtaining a Kentucky sports wagering license. Kalshi Compl. § VI; Polymarket Compl. § VI.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the

---

[8] Compl., *Kentucky v. KalshiEX LLC et al.*, 26-CI-689 (June 17, 2026) ("Kalshi Compl."); Compl., *Kentucky v. QCX LLC et al.*, 26-CI-696 (June 17, 2026) ("Polymarket Compl.").

10

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025). When the federal government is a party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Congress conferred on the CFTC "exclusive jurisdiction" to regulate swaps traded on Commission-regulated exchanges. The Supremacy Clause does not permit Kentucky to extend its consumer protection and gambling laws beyond the casino gambling and sports book wagering that it has traditionally regulated to markets subject to exclusive federal jurisdiction. The Commonwealth's attempts to eliminate federally regulated entities, via enforcement actions and prohibitive fees, interfere with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market and disrupt the operation of those markets both in Kentucky and nationwide. The CEA creates a uniform and predictable nationwide market for futures trading, which is "affected with a national public interest." 7 U.S.C. § 5(a). Kentucky's actions undermine that uniformity, thwart Congress's scheme, and intrude on Plaintiffs' exclusive jurisdiction by subjecting DCMs to a patchwork of fragmented and often conflicting state laws. This not only impedes the CFTC's ability to regulate, advise, and enforce its authority over DCMs but also saddles market participants with excessive compliance costs and uncertainty, stifling one of the CEA's animating purposes: "to promote responsible innovation and fair competition." 7 U.S.C. § 5(b). This Court should enter a preliminary injunction prohibiting Defendants from enforcing state law insofar as they seek to regulate derivatives exchanged on markets regulated by the CFTC.

11

## I.      Plaintiffs have standing

Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, Plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

When the United States brings an action based on federal preemption of state law, it exercises its "standing to seek relief from actual or threatened interference with the performance of its proper governmental functions." *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984); *see United States v. Missouri*, 114 F.4th 980, 984–85 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish" injury for purposes of standing.); *United States v. Florida*, 172 F.4th 1201, 1222 (11th Cir. 2026) ("The United States generally has standing to sue when it alleges an 'injury to its sovereignty arising from violation of its laws.'" (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)) (collecting cases).

Kentucky is actively "impair[ing]" the United States's "legally protected interest in enforcing federal law" by seeking to impose on CFTC-regulated DCMs civil penalties and a prohibitive excise tax for allowing customers to trade federally regulated swaps. But Congress subjected these transactions to the Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). And more broadly, Congress empowered the Commission to administer the CEA's "comprehensive regulatory structure" for derivatives transactions. *Curran*, 456 U.S. at 356. If states can criminally prosecute exchanges for hosting CFTC-approved transactions, the blow to the Commission's sovereign interest as the exclusive regulator of event contracts on DCMs would

12

be substantial. *See KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) ("The CFTC therefore has standing to seek to enjoin Arizona's enforcement of its gambling laws against event contracts traded on DCMs.").

In addition to the sovereign injury to federal interests from Kentucky's actions, the state attempts to ban event contracts have also imposed additional costs on the Commission by disrupting the markets that it regulates. DCMs have sought guidance from the Commission's staff as to appropriate steps to take under the CEA and Commission regulations if ordered to cease operations in particular States. The Commission has devoted resources to determining the necessary compliance requirements, which have diverted Commission resources away from its core function of supervising DCMs and other markets. *See* Ex. A, Hennes Declaration ¶ 7. Kentucky's actions only amplify these diversions.

A "threatened injury" is "actual or imminent" if it is "certainly impending, or there is a substantial risk that the harm will occur." *Department of Commerce v. New York*, 588 U.S. 752, 766–67 (2019). That is the case here: Kentucky has initiated enforcement actions against CFTC-regulated DCMs because they offer CFTC-regulated event contracts. Meanwhile, H.B. 757's 14.25% fee on DCMs' transaction fees and the notional value of all event contracts is undeniable evidence of the Commonwealth's intent to effectively ban DCMs from operating in the State.

Kentucky's actions hang over CFTC-regulated markets, chilling DCMs' operations and confounding the Commission's regulation of a market over which Congress gave it "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A); *see United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024) (rejecting argument "that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law," particularly where "the United States has asserted that the laws at

13

issue may disrupt or interfere with its core constitutional authority"). Kentucky's intrusion into the CFTC's regulatory authority is a classic injury in fact that satisfies Article III's requirements.

**II.     Plaintiffs are likely to succeed in establishing that federal law preempts Kentucky law as applied to commodity derivatives transactions**

Kentucky has no authority to regulate event contracts listed on DCMs for two reasons. First, event contracts qualify as "swaps" under the CEA. Second, Congress gave the Commission "exclusive jurisdiction" to regulate transactions involving swaps, preempting state regulation. Plaintiffs are thus likely to succeed on the merits of their preemption claim.

**A.     Event contracts are "swaps" under the CEA**

Congress "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). A "swap" is a contract that makes payment (1) "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that is (2) "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Event contracts—including those Kentucky alleges are "unlicensed sports wagering"—straightforwardly qualify as "swaps" under this definition.[9] *See Flaherty*, 172 F.4th at 227–28 (holding that "Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

**1.** For starters, event contracts make "payment . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C.

---

[9] The United States Senate agrees. On April 30, 2026, the Senate changed its rules to add a provision barring members from participating in "prediction market[s]" and describing those transactions as "swap[s] … as defined in section 1a of the Commodity Exchange Act … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of a specific event or contingency." S. Res. 708, 119th Cong. (2026).

§ 1a(47)(A)(ii). Consider an event contract in which a participant takes a "yes" position on a Republican winning the Kentucky gubernatorial race in 2026. "[P]ayment" under that contract is plainly "dependent on the occurrence . . . of an event"—namely, a Republican winning the race for governor. Likewise, a "yes" position on a Republican winning more than 55% of the vote is "dependent on . . . the extent of the occurrence of an event"—the extent of the Republican's victory. *See Johnson*, 2026 WL 1223373, at \*4 (explaining that the phrase "*extent of* the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

**2.** Additionally, to be a swap, the "event" on which the payoff is dependent must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The event contracts targeted by Kentucky easily clear the bar. The outcome of a sporting event has the "potential" to affect "numerous . . . stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227–28. And elections have all kinds of financial, economic, and commercial consequences. Those "financial consequences" may not be felt "right away"—indeed, they may never *actually* occur—but "Congress chose to use [the qualifier] 'potential,' which is broad." *Orgel*, 2026 WL 474869, at \*8; *see Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual").

**3.** Moreover, event contracts are also swaps under the definitions set forth in § 1a(47)(A)(i) and § 1a(47)(A)(iv). The former defines a swap as an "option of any kind that is . . . based on the value[] of 1 or more . . . commodities." 7 U.S.C. § 1a(47)(A)(i). Event contracts are "binary options," which "have payoffs that are discontinuous, either paying nothing or a considerable amount depending on the satisfaction of some condition." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 36 (D.D.C. 2015) (citation omitted). And event contracts, which DCMs have listed

15

by the thousands since 2021, 91 Fed. Reg. 12516, 12517 n.9 (Mar. 16, 2026), are "commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv).

**4.** The CEA's "Special Rule" further underscores that event contracts are swaps within the Commission's jurisdiction. The Special Rule provides that "[i]n connection with the listing of . . . swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market or swap execution facility, the Commission may determine that such [contracts] are contrary to the public interest if [they] involve" various enumerated activities, including "terrorism," "assassination," "war," and "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). And an event contract may not be listed if the Commission determines it is contrary to the public interest. *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule thus confirms (1) the Commission's jurisdiction over event contracts involving the enumerated activities, and (2) that the definition of "swap" encompasses event contracts.

**5.** The Special Rule is not Congress's only recognition that swaps are not bets or wagers for regulatory purposes. The Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA) prohibits an online "bet or wager" that is "unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). And the UIGEA's definition of "bet or wager" includes "staking or risking . . . something of value upon . . . a contest of others, a sporting event, or . . . the event of a certain outcome." *Id.* § 5362(1)(A). Yet Congress expressly excluded from the definition of "bet or wager" "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). Swaps, including event contracts, are not bets or wagers under federal law, and federal law makes clear that state laws, including gambling laws, are preempted when applied to federally-regulated derivatives markets.

16

### B.      The CEA preempts state law

Under the Supremacy Clause, "federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016). Most straightforwardly, Congress can "express[ly]" withdraw specified powers from the States. *Arizona v. United States*, 567 U.S. 387, 399 (2012). In addition, "[s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by . . . exclusive [federal] governance." *Id.* "[S]tate laws are [also] preempted when they conflict with federal law." *Id.* Whether on express, field, or conflict preemption grounds, federal law preempts Kentucky state law—including its prohibitive regulatory fee—as applied to event contracts traded on CFTC-regulated DCMs.

### 1.      The CEA expressly preempts state regulation of commodity derivatives transactions

The CEA confers on the Commission "exclusive jurisdiction" to regulate "accounts, agreements, . . . and transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). That is plainly an expression of preemptive intent. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("[T]he plain wording of the clause . . . contains the best evidence of Congress' preemptive intent."). If the Commission has "exclusive jurisdiction . . . with respect to" event contracts, other governmental authorities—including the States—necessarily lack "jurisdiction" over event contracts. 7 U.S.C. § 2(a)(1)(A); *see Curran*, 622 F.2d at 232 ("[T]he thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation.").

When it granted the CFTC "exclusive jurisdiction" over swaps, Congress went further than merely nullifying inconsistent state law. The CEA vests sole regulatory jurisdiction in a federal agency, displacing state law and, with narrow exceptions (discussed *infra*), state enforcement. *Cf. Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 687 (7th

17

Cir. 2011) (Class I gaming "is left entirely 'within the exclusive jurisdiction of the Indian tribes'" and thus "remains unregulated by state or federal law" (quoting 25 U.S.C. § 2710(a)(1))).

The balance of § 2(a)(1)(A) reinforces that default rule. It states that "[e]*xcept as hereinabove provided*," Congress did not "supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State" or "restrict" state authorities "from carrying out their duties and responsibilities." 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA thus contemplates states retaining regulatory jurisdiction "[e]xcept" with respect to "accounts, agreements . . . and transactions involving swaps." *Id.*; *see Johnson*, 2026 WL 1223373, at *6 (holding that this "savings clause underscores the [CEA's] preemptive effect"). Therefore, "courts have held that [§] 2(a)(1) of the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *see Christensen Hatch Farms, Inc. v. Peavey Co.*, 505 F. Supp. 903, 910 (D. Minn. 1981) (same). Such a savings clause would be unnecessary if it were otherwise. *See Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) ("to give 'full effect' to both the savings clause and the jurisdictional clause," "preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market'").

The CEA's narrow carve-outs for state authority underscore the primacy of federal law. Section 13a-2(1), for instance, empowers a state to file suit to enjoin violations of the CEA or a Commission regulation. 7 U.S.C. § 13a-2(1). The natural implication is that states generally lack authority to apply their *own* laws to CFTC-regulated transactions.[10] And even when purporting to enforce the CEA, states cannot sue "a contract market," 7 U.S.C. § 13a-2(1), doubling the inference that States cannot criminalize the operation of a CFTC-registered prediction market.

---

[10] States may sue in state court for "an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). Again, the implication is that States cannot sue for alleged violations of *other* state laws, such as laws that target a class of derivatives.

18

Likewise, Section 16(e)(1) insulates various laws and actions from preemption, including state laws applicable to certain *off-DCM* transactions or *unregistered* persons. 7 U.S.C. § 16(e)(1)(B)–(C). Yet Congress omitted any potential for state law to apply to *on-DCM* transactions or *registered* persons, *id.*, further reinforcing that state law has no application to swap transactions and DCMs.

Some courts have pointed to *other* preemption provisions—namely, § 16(e)(2) and § 16(h)—and concluded that because they do not expressly preempt state gambling laws as to CFTC-regulated swaps, such laws remain enforceable. *E.g.*, *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 681 (D. Md. 2025). Neither provision, however, diminishes § 2(a)(1)'s preemptive force. *See Monsanto Co. v. Durnell*, __ U.S. __, 2026 WL 1825691, at *10 (June 25, 2026) (warning that a statute's clarification of its scope cannot be read to "effectively erase . . . [an] express preemption clause.").

Section 16(e)(2) was added to clarify that even when a contract is "excluded" or "exempted" by the CFTC, the CEA nonetheless "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming" as to that contract. 7 U.S.C. § 16(e)(2); *see Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1057 (9th Cir. 2003) ("[W]here the CFTC exempts transactions from the CEA pursuant to Section 4(c), those same transactions benefit from preemption of state bucket shop laws under Section 12(e)(2)(A)."). Section 16(e)(2) provides legal certainty that Section 16(e)(1)'s carve-out from the CEA's exclusive jurisdiction does not extend to state gambling laws as applied to excluded or exempted transactions. Read in context, Section 16(e)(2) *confirms* Section 2(a)(1)'s preemptive effect.

Section 16(h) provides that a swap "shall not be considered to be insurance" and accordingly "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h). The preemption of state insurance law in no way implies the nonpreemption of other state

19

laws. Section 16(h) was enacted in the aftermath of the 2008 financial crisis, which many in Congress attributed to credit default swaps—"an arrangement similar to an insurance contract." *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008). Under the circumstances, Congress's use of a "belt and suspenders approach to make sure that *all*" swaps were governed by federal law is a perfectly "likely" inference, *see Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020), far more "likely" than the notion that Congress only preempted state insurance law as to swaps but implicitly left other state law intact.

### 2.    The CEA occupies the field of regulating trading on a DCM

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation,'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018), or when "a federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona*, 567 U.S. at 399. "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

As the Third Circuit held, the CEA preempts the field of "regulation of trading on a DCM (a form of futures trading)," making state prohibitions on event contracts unlawful. *Flaherty*, 172 F.4th at 229. Congress gave the Commission "exclusive jurisdiction" over "swaps . . . traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided." 7 U.S.C. § 2(a)(1)(A). DCMs, moreover, are subject to extensive regulation by the Commission. They must, among other things, apply for registration with the Commission, *id.* § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of DCMs, . . . leaving no room for state regulation." *Johnson*, 2026 WL 1223373, at *6; *see also Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001)

20

("Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions.").

Congress understood this when it created the CFTC and the "comprehensive regulatory structure" it charged the Commission with administering. *Curran*, 456 U.S. at 356. As the Conference Report details, the "exclusive grant of jurisdiction" to the Commission was designed to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35–36 (1974). Congress also deleted from the CEA language that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974); *see Effex Cap.*, 933 F.3d at 894 ("[A] catalyst for the significant [1974] amendments to the Commodity Exchange Act was a fear that, without increased federal regulation, the states would regulate the futures markets to a chaotic effect.").

The enactment of the Special Rule in 2010 further consolidated the Commission's control over the field of event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C). That Rule, again, grants the Commission discretionary authority to approve or disapprove of event contracts that involve certain enumerated categories of activity. *Id.* § 7a-2(c)(5)(C)(i)–(ii); 17 C.F.R. § 40.11(c)(2). By creating a specific public-interest review process, Congress clearly signaled that these contracts are within the Commission's exclusive regulatory purview, not the States'. By initiating enforcement actions and enacting prohibitory fees, Kentucky is targeting event contracts squarely within the contemplation of the Special Rule—yet another indication that the law directly invades the Commission's exclusive domain.

"[A]t the very least," then, the CEA preempts the field of "regulation of trading on a DCM," which covers "event contracts" traded on prediction markets. *Flaherty*, 172 F.4th at 228–29.

### 3. Kentucky's application of its laws to commodities derivatives contracts conflicts with the CEA and Commission rules

Finally, "conflict preemption . . . prohibits [a State] from regulating sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 229. Conflict preemption occurs when "compliance with both state and federal law is impossible" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pharmacy Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024). Both apply here.

**1.** If DCM-hosted swaps are subject to state regulation, including gambling laws and prohibitive excise fees that only apply to federally regulated markets, then compliance with both state and federal law is impossible. Federal law requires a DCM to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). If Kentucky is allowed to single out DCMs, however, then those DCMs will be forced to discriminate against Kentuckians by either passing on their considerable costs or delisting event contracts there entirely. That would violate the requirement of "impartial" and "non-discriminatory" access. *See Johnson*, 2026 WL 1223373, at *8 (holding that if event contracts are prohibited under Arizona law, "a DCM operator must exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1)").

**2.** If nothing else, subjecting CFTC-regulated markets to state-by-state requirements would stand as an impermissible obstacle to federal regulation. "As Congress recognized in enacting the [CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric.*

22

*Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see Johnson*, 2026 WL 1223373, at *8 ("If states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange."). Thus, allowing states to regulate event contracts could reintroduce the "total chaos" Congress sought to prevent by providing the Commission exclusive jurisdiction over futures trading in 1974.[11] And it would encourage the kind of "interference with the discretion that federal law delegates to federal officials [that] goes to the heart of obstacle preemption." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) (en banc).[12]

## III.    The remaining factors favor granting preliminary relief

It is well established that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). Supremacy Clause violations are no exception. *See United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the [Supremacy Clause]."); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) ("If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements."). After all, the United States is injured "when its valid laws in a domain of federal authority are undermined by impermissible state regulations," *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see supra* 12–14, and because that injury cannot be undone by an eventual award

---

[11] *See* Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

[12] Kentucky's intrusion into the CFTC's jurisdiction also violates the Supremacy Clause because it violates intergovernmental immunity. "Just as [Kentucky] cannot regulate the federal government itself, [it] cannot regulate private parties in a way that severely undercuts a federal function." *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322 (3d Cir. 2025).

23

of damages, it is necessarily irreparable. *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (irreparable harm occurs where "there is a clear and present need for equitable relief").

The Commission's "exclusive jurisdiction" over derivatives markets is meaningless if States can effectively banish contract markets they disfavor. 7 U.S.C. § 2(a)(1)(A). Kentucky's enforcement actions and special excise tax on federally regulated exchanges would not only hamper the Commission's ability to foster an efficient, orderly, national derivatives market—it would destroy one of the very markets the CFTC is tasked with overseeing. If the Commonwealth's campaign against prediction markets succeeds, it will result in exactly the type of patchwork regulation and market distortions that the CEA was enacted to prevent. *See Flaherty*, F.4th at 230 ("[Such] state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC.") Absent an injunction, DCMs will be unable to offer a host of federally regulated swaps in Kentucky, even though the CFTC's authority to authorize those contracts falls within its exclusive jurisdiction. There is no remedy at law for such an injury.

The public interest and equities prongs merge when the United States is a party because "[f]rustration of federal statutes and prerogatives are not in the public interest." *Alabama*, 691 F.3d at 1301. And where a state law is preempted, the state is not "harm[ed] from . . . nonenforcement of invalid legislation." *Id.* Accordingly, it is neither equitable nor in the public interest to allow states to discriminate against prediction markets in violation of the Supremacy Clause. *See Flaherty*, 172 F.4th at 232; *see also Churchill Downs*, 162 F.4th at 643 ("enjoining the enforcement of a [state gambling] law that violates constitutional rights 'is always in the public interest'").

On the other hand, the "remedy" of "a continuing constitutional violation . . . certainly would serve the public interest." *Preston*, 589 F.2d at 303 n.3. The public interest in an injunction is heightened here, given that H.B. 757's fees and the Commonwealth's aggressive enforcement

24

posture pose imminent threats to the CFTC-regulated market for the trading of event contracts on DCMs operating in Kentucky.

Finally, were the Court to hold that event contracts are not swaps (*but see supra* 14–16), that could deprive the Commission of *any* jurisdiction over event contracts, thereby creating further regulatory uncertainty nationwide and undermining the Commission's jurisdiction over event contracts in general. The Commission's jurisdiction to bring enforcement actions for insider trading on prediction markets, for example, has been premised on event contracts qualifying as swaps. *See Van Dyke*, Dkt. No. 1 ¶¶ 61, 72, 81; *Spagnuolo*, Dkt. No. 1 ¶¶ 27, 29, 50. If that premise is rejected, the Commission's jurisdiction would become more tenuous.

The Court should not tolerate this massive short-circuiting of the Commission's jurisdiction. Congress created "a comprehensive regulatory structure" over "futures trading," *Curran*, 456 U.S. at 356, and it vested jurisdiction over swaps—including event contracts— exclusively with the Commission. Kentucky's incursions into the Commission's domain are unlawful. At minimum, the Court should preserve the status quo by entering a preliminary injunction, which would protect the federal government from irreparable harm and preserve market stability while the Court considers the merits.

## CONCLUSION

The United States and the Commission respectfully ask this Court to enter a preliminary injunction prohibiting Defendants from enforcing Kentucky state law preempted by the Commodity Exchange Act through any criminal or civil enforcement actions related to event contracts listed on CFTC-regulated Designated Contract Markets.

Dated: June 30, 2026

Respectfully submitted,

By: */s/ David W. Rubin*
David W. Rubin
Senior Assistant General Counsel
U.S. Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 418-5734
drubin@cftc.gov

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
tiberius.davis@usdoj.gov
Tel. 202-860-8970

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
alexandra.schulte@usdoj.gov
Tel. 202-718-0483

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
  General Counsel
M. JORDAN MINOT (jminot@cftc.gov)
  Deputy General Counsel
DAVID W. RUBIN (drubin@cftc.gov)
  Senior Assistant General Counsel
HENRY J. DICKMAN (hdickman@cftc.gov)
  Senior Assistant General Counsel
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
Tel. 202-209-1087
Fax. 202-418-5567